1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   UNITED STATES of AMERICA,

4             -against-                    16 Cr. 832(KMK)
                                           Hearing
5   NICHOLAS TARTAGLIONE,

6               Defendant.

7   ------------------------------------x

8
                                    United States Courthouse
9                                   White Plains, New York

10                                  November 21, 2017

11

12  B e f o r e:  THE HONORABLE KENNETH M. KARAS,
                                    District Court Judge
13

14

15  A P P E A R A N C E S:

16  JOON KIM
    Acting United States Attorney for
17  the Southern District of New York
    MAURENE COMEY
18          Assistant United States Attorney

19  BRUCE BARKET
    DONNA ALDEA
20  AIDA LEISENRING
    MARK DE MARCO
21      Attorneys for Nicholas Tartaglione

22  GEORGE GOLTZER
    YING STAFFORD
23      Attorneys for Joesph Biggs

24

25

                Angela O'Donnell, RPR, 914-390-4025

1              THE CLERK:  The Honorable Kenneth M. Karas presiding.

2              United States of America versus Nicholas Tartaglione.

3    16CR832.  Counsel, please state your appearances.

4              MS. COMEY:  Good afternoon, your Honor.

5              Maurene Comey for the government.

6              THE COURT:  Good afternoon, Ms. Comey.

7              MR. BARKET:  Good afternoon, your Honor.

8              Bruce Barket, Donna Aldea, Aida Leisenring and Mark

9    DeMarco for Mr. Tartaglione.

10             THE COURT:  All right.  Good afternoon to you all.

11             MR. GOLTZER:  Good afternoon, sir.  George Goltzer

12   and Ying Stafford for Mr. Biggs.

13             THE COURT:  Sorry about the screen.

14             MR. DEMARCO:  That's okay, Judge.

15             THE COURT:  Was it up when you came in?

16             MR. DEMARCO:  Yeah.  It was up.  I just figured I've

17   got to lower it.

18             THE COURT:  Okay.

19             MR. DEMARCO:  We're good.

20             THE COURT:  All right.  I think that belongs to your

21   office.  Not your responsibility.

22             MS. COMEY:  Yes, your Honor.

23             THE COURT:  I don't want to dime out the person who

24   did it, but his last name rhymes with "Ember."

25             MS. COMEY:  I believe the IT specialist who's

                    Angela O'Donnell, RPR, 914-390-4025

1    responsible for that is out sick today, your Honor.

2           THE COURT:  No.  It's Dember's fault.  Don't shift

3    the blame.

4           All right.  So we're here on a motion to compel

5    disclosure of information.  I have read the papers.  I don't

6    know who wants to argue on behalf of Mr. Tartaglione.

7           MS. ALDEA:  I'll be arguing, your Honor.

8           THE COURT:  All right.  Good afternoon.

9           MS. ALDEA:  Good afternoon, your Honor.

10          THE COURT:  Good afternoon.

11          MS. ALDEA:  As Bruce said, my name is Donna Aldea.

12    This is my first appearance here, so I'm saying hello formally.

13    First physical appearance.

14          THE COURT:  Welcome.

15          MS. ALDEA:  I know you've read the material.  The way

16    that I'm going to structure the argument is I'm going to start

17    by showing that this really is *Brady* material.  I think that's

18    one of the main points of contention.

19          Second, that the Government's disclosure that they've

20    made so far, which is the content but without any witness names

21    and without the specific statements, is not sufficient to

22    satisfy their *Brady* obligations.

23          And, finally, that under the circumstances of this

24    case, this Court should, in fact, order disclosure now and that

25    this Court clearly has the authority to order disclosure right

 1   now of this material.

 2          So first with respect to the question of whether

 3   there is *Brady* material.  All that's required is that this be

 4   material to guilt or punishment, and in this case, it clearly

 5   is material to both.  On this point, with respect to the

 6   materiality to guilt, there's no question that statements,

 7   witness statements that show that Mr. Tartaglione was not

 8   present at the time that three of the victims were shot, and

 9   that Mr. Tartaglione, obviously, did not fire the weapon is

10   exculpatory.

11          THE COURT:  Can I just interject?

12          MS. ALDEA:  Of course.

13          THE COURT:  At least in the original papers, there

14   was sort of two layers to this.  There was *Brady*-like material

15   that would be material to your presentation to the Justice

16   Department.

17          MS. ALDEA:  Correct.

18          THE COURT:  And then of course there's the trial,

19   right that is actually *Brady* violation of *Brady* material.  Are

20   you approaching both of these?

21          MS. ALDEA:  Yes, your Honor.

22          THE COURT:  Okay.  So, okay, I just want to make sure

23   I'm clear on that.

24          All right.  Go ahead.

25          MS. ALDEA:  So in that order, I'll actually start

1  with respect to the DOJ internal capital review case process.

2  So the government stated in its materials, in its opposition,

3  that *Brady* does not apply here and, in fact, it actually, a

4  quote, that the government said that a request for *Brady*

5  material for this purpose has no legal basis.

6          THE COURT:  They cite some cases that are to that

7  effect.

8          MS. ALDEA:  Correct.  They cite two cases.

9          THE COURT:  Right.

10         MS. ALDEA:  They cite two district court cases that

11  are not directly point; *United States versus Roman*, and *United*

12  *States versus McVeigh*.  They're two 1996 cases.

13         Now, in addition to the materials that we initially

14  cited for this proposition in preparation for oral argument --

15         THE COURT:  Yes.

16         MS. ALDEA:  -- there are dozens of cases that hold to

17  the contrary.  One that I'd like to highlight, *United States*

18  *versus Jackson*, is a Southern District case decision by this

19  Court that is from 2003, where the Court specifically said that

20  under Department of Justice procedures, defense counsel is

21  entitled to make submissions to both the US Attorney and the

22  Department of Justice, arguing that the Attorney General's

23  discretion should be exercised against seeking the death

24  penalty and then clearly held that in these circumstances

25  penalty determination relevant material within the scope of

1    *Brady versus Maryland* and its progeny, must be produced in time

2    to be used in defense counsel's argumentation against pursuit

3    of the death penalty to both the United States Attorney and the

4    Department of Justice.

5              THE COURT:  So *Brady* is a trial right that your

6    client has; correct?

7              MS. ALDEA:  Well, it's a right to material.  It's a

8    due process right.

9              THE COURT:  But it's a due process right that relates

10   to trial.  So that, as we know from Judge Cabranes's analysis,

11   the tricky thing for a prosecutor is the test as to whether or

12   not there's a *Brady* violation happens after the trial.

13             MS. ALDEA:  Correct.

14             THE COURT:  The prosecutor is warned not tap too

15   closely to the danger line, but at the end of the day that is

16   the test.

17             MS. ALDEA:  Well, that, I would like to address in

18   the third portion of it, which is respect to the timing --

19             THE COURT:  But it's a trial right.

20             Put it this way, if the government fails to produce

21   *Brady* material in a case where the defendant is acquitted, is

22   there a *Brady* right violation?

23             MS. ALDEA:  So it's not entirely a trial right, I

24   guess I disagree with that.

25             THE COURT:  If you could just answer my question.

1              MS. ALDEA:  Yes.

2              THE COURT:  If somebody is acquitted and they claim

3    after the trial and the government failed to produce Brady

4    material after, is there a due process violation?

5              MS. ALDEA:  If somebody is acquitted --

6              THE COURT:  Yes, right.

7              MS. ALDEA:  -- no.  There is not.

8              THE COURT:  Because at the end of the day, the result

9    of the trial wasn't changed --

10             MS. ALDEA:  Correct.

11             THE COURT:  -- by the failure to produce *Brady* --

12             MS. ALDEA:  Correct.

13             THE COURT:  -- which makes it a trial right.

14             MS. ALDEA:  Well, no, the result was not changed.

15   The reasoning behind all these cases --

16             THE COURT:  As a result of the trial.

17             MS. ALDEA:  Well, but the reasoning behind all these

18   cases dealing with materiality to guilt or punishment, if the

19   government in this case decides as a result of the DOJ

20   review --

21             THE COURT:  Yes.

22             MS. ALDEA:  -- not to seek the death penalty --

23             THE COURT:  Yes.

24             MS. ALDEA:  -- there is no more compelling thing that

25   will change the outcome of this litigation; the outcome of the

1    proceedings.

2              THE COURT:  Right.  But the question is, what rights

3    does someone have with regard to the DOJ process, because the

4    DOJ process, which is really the bureaucratic means by which

5    the prosecution decides to exercise its discretion to seek the

6    death penalty.

7              MS. ALDEA:  Correct.

8              THE COURT:  And there's no Constitutional right to

9    the DOJ process that they have in place; right?

10             I mean, Ms. Comey, if she wanted to, if she have the

11   authority, could say, I have decided on behalf of the United

12   States government to seek death penalty here, and that's it and

13   that's how we go forth.

14             The fact is that the DOJ has its own system in place,

15   but not because the Constitution compels it.

16             MS. ALDEA:  Well, but, your Honor, that's not what

17   the case law has held.

18             THE COURT:  I know, but the case law is not binding

19   so what I want to know is where in the Constitution do you

20   think there's a right to the process that's even in place?

21             MS. ALDEA:  There may not -- to the extent that there

22   is a procedure that is put in place, the Constitution gives the

23   defendant the right to due process.  In other words, the

24   ability to take advantage of that procedure.

25             THE COURT:  Process, okay, so you're talking about

                  Angela O'Donnell, RPR, 914-390-4025

1    procedural due process?

2              MS. ALDEA:  Correct.

3              THE COURT:  So procedural due process is the process

4    that's due; right?  And where in the Constitution, where is

5    there any authority that says that the process that your

6    client's due is the DOJ process that they had put into place?

7              MS. ALDEA:  Well, I mean, I can't point to the

8    Constitution except broadly for due process considerations.

9              THE COURT:  But are you saying that the Constitution

10   compels the process that the Justice Department uses?

11             MS. ALDEA:  The Constitution does not compel that

12   process.

13             THE COURT:  They don't have to have that process.

14             MS. ALDEA:  Correct.  I agree with your Honor;

15   however, once that process is the put into place, the reasoning

16   of the decision that I read you, the Southern District decision

17   that I read to you, is essentially that.  That because, under

18   the procedures that the Department of Justice puts in place,

19   the defense counsel is entitled to make submissions, and

20   because prior to deciding whether to request approval to seek

21   the death penalty the United States Attorney should give

22   counsel for the defendant a reasonable opportunity -- I'm

23   reading from the case.

24             THE COURT:  No, I understand, but that presupposes an

25   entitlement.  I mean, the due process clause applies when there

1   is some entitlement.  If the Justice Department announced

2   tomorrow it's scrapping its capital review process as it now

3   exists, how would that violate the Constitution?

4            MS. ALDEA:  If there is no process that is available,

5   then there obviously wouldn't be an ability for the defense to

6   make the submission in the first place --

7            THE COURT:  Right.

8            MS. ALDEA:  -- and there could be no change in the

9   outcome of the proceedings as a result of that.

10           THE COURT:  Right.  So in other words --

11           MS. ALDEA:  But if the process is available --

12           THE COURT:  But the process is not something that

13   your client is entitled to.  It's something that the government

14   gives to everybody who's potentially eligible for the death

15   penalty by virtue of it's own decision, but it's not something

16   that creates an entitlement.

17           MS. ALDEA:  So in other contexts, just arguing

18   broadly --

19           THE COURT:  Yes.

20           MS. ALDEA:  -- in other contexts where there is no --

21   there is not a constitutional entitlement to a hearing for

22   certain civil proceeding, for instance --

23           THE COURT:  Yes.

24           MS. ALDEA:  -- nonetheless, when those proceedings

25   are held, courts have found that there is still due process

1    that attaches to ensure --

2              THE COURT:  Not when there's no entitlement.  Not

3    when there's no entitlement.

4              So, for example, in the zoning context, if somebody

5    says that I wanted to change the zoning of my property and I

6    wasn't given the process I was due, and the courts uniformly

7    say when there's no entitlement to the benefit you seek, then

8    there's no process that you are due under the due process

9    clause.

10             MS. ALDEA:  Yes, but when there is -- the entitlement

11   is not a Constitutional entitlement, but there is, nonetheless,

12   a procedure that has been put in place.

13             THE COURT:  That's gratuitous.

14             MS. ALDEA:  I'll answer the question another way from

15   a different case.

16             the couret:  Yeah.

17             MS. ALDEA:  And this one, aside from the Southern

18   District case, there's another case that's also directly on

19   point.  And, again, there are literally dozens of these cases.

20             THE COURT:  None of which is cited in your reply

21   letter.

22             MS. ALDEA:  Correct, your Honor.

23             THE COURT:  So in the future it would be useful.

24             MS. ALDEA:  Yes, your Honor.

25             THE COURT:  I read the cases you tell me to read.

1          MS. ALDEA:  And as I said, I did cite some of these

2     cases in the initial submission.  As I was preparing for oral

3     argument, I actually found more cases when I was contemplating

4     that we might have a discussion about this point.

5          THE COURT:  Yes.

6          MS. ALDEA:  The other case is *United States versus*

7     *Delatorre* and it approaches it from a slightly different angle.

8     This is a 2006 case from the Northern District of Illinois that

9     ordered production of all *Brady* and Rule 16 discovery

10    preauthorization.  And in that case, what the court found, is

11    the court said that even though the USAM does not create

12    substantive rights, as your Honor is a saying; however, the

13    defendants still have the right to discovery, District Courts

14    have broad discretion with respect to the discovery motions in

15    criminal cases, and this Court agrees that the exigencies of

16    capital litigation compel, as a practical matter, in order to

17    ensure the fair and orderly disposition of the case, prompt

18    disclosure of all information which will affect the choice of

19    penalty.  As several defendants here are presently subject to

20    the possible sentence of death, the courts says this warrants

21    especially careful treatment as capital punishment is

22    qualitatively different than any other form of punishment.

23          So to answer your question from that perspective,

24    which is a slightly different tact than the Eastern District

25    took -- sorry, the Southern District took in the prior case,

13

1   part of it is due process is heightened due process in this

2   context because we have a capital case.  So death is different.

3   That's number one.

4          Number two is that the questioned that your Honor is

5   asking about whether or not there's constitutional entitlement

6   is different from the question of whether your Honor has the

7   authority and ability in the exercise of your discretion to

8   order the discovery.  So I agree with you that there is no --

9   and *Delatorre* would agree with you -- there is no substantive

10  right that is created.

11         THE COURT:  Right.

12         MS. ALDEA:  However, because heightened due process

13  applies, because this is a capital case, because this decision

14  is the single-most decision that is going to be made, probably

15  throughout the entire course of this litigation, this Court

16  should, as these other courts have, exercise its discretion to

17  order the discovery for this purpose.

18         THE COURT:  So when you say the discovery, the

19  question is what does that mean?  Is it the discovery or is it

20  the information?  Because the information about your client's

21  absence when the other three gentlemen were shot, you had been

22  given that information.

23         MS. ALDEA:  Correct.

24         THE COURT:  So that fact has been given to you.

25         MS. ALDEA:  Correct.  So now --

Angela O'Donnell, RPR, 914-390-4025

```
 1              THE COURT:  So let's put that to the side for a
 2    second.  Let me ask you a question.
 3              To the extent the government is saying that its
 4    theory of the case is that Mr. Tartaglione was there for the
 5    shooting of the first individual, and then left, and was not
 6    there for the shooting of the other three individuals, why is
 7    information that is consistent with that Brady?
 8              MS. ALDEA:  Okay.  So the first thing is, there was
 9    no shooting of the first individual, so the first --
10              THE COURT:  The first individual, whatever happened
11    to the first individual.  The point is, the three individuals
12    who were shot, your client's not there for, which the
13    government says is precisely its theory of the case.
14              MS. ALDEA:  Well, so here's the thing --
15              THE COURT:  Forgetting what they said in May.  What
16    the government is saying right now is its theory of the case is
17    whatever happened with the first individual, the other three
18    who were shot, your client was not present when that happened.
19              MS. ALDEA:  Correct.
20              THE COURT:  That's their theory of the case.
21              MS. ALDEA:  Well, that's their adopted theory of the
22    case.
23              THE COURT:  That's their theory of the case.
24              MS. ALDEA:  Okay.
25              THE COURT:  Okay?  So, if that's their theory of the
```

1    case, what's *Brady* about them telling you that that's their

2    theory of the case?

3            MS. ALDEA:  So the Supreme Court has repeatedly drawn

4    the difference between a legally sufficient case and what

5    constitutes exculpatory material or materiality for purposes of

6    *Brady*.

7            THE COURT:  Of course.  Right.

8            MS. ALDEA:  So the way that I would distinguish that

9    is this:  If evidence tends to been benefit the defense, in

10   other words, if evidence is material to the issue of guilt or

11   punishment, then it constitutes *Brady* material.  So in this

12   case, the reason that it would be material, it's going to be,

13   in truth, the focal point of the entire defense of this case.

14   Probably the single-most probative fact to Mr. Tartaglione's

15   distancing from the conspiracy, to the fact that he did not act

16   in an aiding and abetting fashion, or as an accomplice to the

17   homicides of at least three of the victims in this case that

18   were shot.

19           THE COURT:  Right.

20           MS. ALDEA:  And to all the charges that specifically

21   target the use of a firearm, because he's charged specifically

22   with those three.  The focal point of the defense is going to

23   be, he wasn't present when this happened --

24           THE COURT:  Right.

25           MS. ALDEA:  -- so he couldn't have shared in the

1    intent, and he didn't pull the trigger.  So he didn't commit

2    the act.  That goes to the guilt as opposed to the punishment

3    phase.

4              THE COURT:  Sure.

5              MS. ALDEA:  So because of that, this information is

6    exculpatory.  Now in the prosecution --

7              THE COURT:  No.  Wait.  Wait.  Wait.  Wait.  Wait.

8    Wait.  Let's stop.

9              At this point, what's the difference between your

10   theory of the case and the government's theory of the case?

11             MS. ALDEA:  Well, the difference between the theory,

12   I guess, is that the Government's theory is that in spite of

13   his absence --

14             THE COURT:  Right.

15             MS. ALDEA:  -- they have other proof available to

16   him that to show that he nonetheless commanded, importuned,

17   aided, abetted, whatever it is --

18             THE COURT:  The key fact, from your perspective, is

19   your client's absence from the other three that were shot.

20             MS. ALDEA:  Correct.

21             THE COURT:  The government says exactly that is, we

22   agree with that fact.  So if that's the key fact from your

23   perspective, and the government agrees with that key fact,

24   where is there daylight between your theory as to where your

25   client was when these three individuals were shot, and the

                 Angela O'Donnell, RPR, 914-390-4025

1    government's theory as to where your client was when these

2    three individuals were shot?

3              MS. ALDEA:  But that's not what *Brady* material

4    requires.

5              THE COURT:  Answer the question.

6              Where's the daylight between those two?

7              MS. ALDEA:  Both of us agree, at this point --

8              THE COURT:  Yes.

9              MS. ALDEA:  -- that he was not present when they were

10   shot.

11             THE COURT:  Okay.  And that's a fact that you want

12   information, you want the source of that information.

13             MS. ALDEA:  Correct, your Honor.

14             THE COURT:  But you have the fact itself that your

15   client wasn't there when these three individuals were shot.

16             MS. ALDEA:  Okay.

17             THE COURT:  So I don't understand how it's

18   exculpatory when it's the government saying that that's

19   consistent with their theory of the case.

20             MS. ALDEA:  Being consistent with their theory

21   doesn't mean that the information doesn't have exculpatory

22   value, and I'll answer it with an example from another case.

23             THE COURT:  It may have exculpatory value, but you

24   have the information that he wasn't present when the other

25   three were shot.

```
 1              MS. ALDEA:  But the information that we have is not
 2     sufficient, because it lacks the specificity that would be
 3     required.
 4              THE COURT:  He wasn't there when they shot; what else
 5     are you entitled to in terms of what's Brady?  You're not
 6     entitled to why the government thinks he's nonetheless still
 7     guilty.
 8              MS. ALDEA:  No.
 9              THE COURT:  Right?  If their theory is --
10              MS. ALDEA:  No.  No, no.
11              THE COURT:  If their theory is that he aided and
12     abetted in some other way or he commanded in other way, I don't
13     know what their theory is, they're not required to share that
14     with you because that's inculpatory.
15              MS. ALDEA:  Correct, your Honor, I agree.
16              THE COURT:  So I don't understand what fact you're
17     missing, because the material fact is he's not there.  They say
18     that he's not there.  That's part of their theory of the case.
19              So what other information, in terms of information --
20     not the source of the information -- what other information do
21     you think is exculpatory in that regard?
22              MS. ALDEA:  Well, the statements themselves are
23     information that we would be entitled to with specificity as
24     well as the source.
25              THE COURT:  Why?  Why?
```

1          The statement of he wasn't there is the same as the

2     information the government provided you that he wasn't there.

3          MS. ALDEA:  Because the precise statement that is

4     used is the statement that would contain the investigative

5     leads that would allow us to follow it.

6          THE COURT:  Let's just say that I don't know what the

7     basis entirely of the government's saying they know he wasn't

8     there.  Let's assume it is a statement of the individual; he

9     wasn't there, he left.

10         Okay.  He wasn't there.  He left.  Let's assume

11    that's the case.  So you've been told that.  So all you want is

12    the source of the information which doesn't add anything to the

13    fact that he wasn't there.

14         MS. ALDEA:  Well -- so in *Leka versus Portuondo*,

15    which is a Second Circuit case --

16         THE COURT:  Yes, I read it.

17         MS. ALDEA:  The court dealt specifically with the

18    prosecution told the defense that a witness who had seen the

19    shooting and could identify the defendant.

20         THE COURT:  Yes.

21         MS. ALDEA:  And then subsequently nine days before

22    the opening, 23 days before the defense case, the prosecution

23    told the defense this witness can't make an identification.

24    And the court found that the absence of the name of that

25    witness disclosed at a time when the defense could actually

1   make use of it, and the absence of the specific content of what

2   the witness said, in other words, the entire statement, was

3   essential and should have been disclosed under *Brady*.   The

4   district court said --

5           THE COURT:   That's not this case.   That's not this

6   case.

7           MS. ALDEA:   But, your Honor --

8           THE COURT:   That's not this case.

9           MS. ALDEA:   It may be.

10          THE COURT:   What you have is the fact that he wasn't

11  there.   That's the key fact.   And anyways, what you're not

12  grasping is, that is the government's theory of the case.   So I

13  still don't understand what else you think -- the government

14  says it complied with its *Brady* obligation.   They've told you

15  this fact, which they say anyways is consistent with their

16  theory of the case, so you want more, but I don't understand

17  why you think you're entitled to more.

18          MS. ALDEA:   The government's theory of the case is it

19  is a weakness in the government's case that he is not there.

20          THE COURT:   Which they've conceded or acknowledged.

21          MS. ALDEA:   I understand.

22          So but with respect to the first question, the fact

23  that they're saying we can prove that he aided and abetted and

24  was responsible, notwithstanding the fact he wasn't there --

25          THE COURT:   Which is not a radical concept, but, yes.

1           MS. ALDEA:  Well, it's not.  But that doesn't mean

2     that we're not entitled to the exculpatory information that

3     shows that, in fact, he was not there, who said it, the context

4     in which they said it and what they said.

5           THE COURT:  Why are you entitled to who said it?

6           Why are you entitled to who said it?

7           MS. ALDEA:  Because --

8           THE COURT:  You're entitled to know that he wasn't

9     there.  You've been told that.  Why are you entitled to who

10    said it?  Assuming that that's the basis of their knowledge.

11          MS. ALDEA:  Because what we're entitled to under

12    *Brady* is a level of specificity that affords the defense an

13    opportunity for use and that is an opportunity for a

14    responsible lawyer to use the information with some degree of

15    calculation and forethought.  It can't just be a conclusion; he

16    wasn't there.  It needs to be enough to allow us, in this case,

17    and in *Leka*, actually, where the name was at issue, to go and

18    conduct an investigation; to question the witnesses that may

19    have provided the information; to question the sources that

20    they may have given that information to.

21          When all we have is the statement, it's like

22    saying -- it's like saying that the government has told us,

23    look, we acknowledge that the defendant didn't pull the

24    trigger.  If we don't know why they know that he didn't pull

25    the trigger, we don't know who told them that he didn't pull

22

1    the trigger.  We can't conduct an independent investigation of

2    that to elicit investigative leads that will ultimately show

3    the fact that he didn't pull the trigger also shows that he's

4    not responsible for the killing.

5            So having the information without context, having the

6    information without names, makes it useless and that's why --

7            THE COURT:  That is, counsel, that is such an

8    exaggeration.  I mean, that is such an exaggeration, and you

9    really don't have any case that says you're entitled to that

10   broad a right, because otherwise you would have a plethora of

11   cases that say, every time the government reveals information

12   that's exculpatory, they have to reveal the source of the

13   information.  You don't have a case that says that.

14           There's no *per se* rule that says you have to tell us

15   the source of the exculpatory information.  There's no case

16   that says that.

17           MS. ALDEA:  There's no case that says that.  I agree

18   with your Honor.

19           THE COURT:  Okay.

20           MS. ALDEA:  However, the question, again, and I have

21   to draw this distinction, there's a question -- there's a

22   difference between the issue of whether we have a

23   Constitutional right to it in the sense that we have to be

24   given that information now, and whether your Honor has the

25   discretion to order it, because under the circumstances of the

1    case, it would ultimately run the risk of tacking too close to

2    the wind, as your Honor had said before.

3            THE COURT:  Yeah.

4            MS. ALDEA:  Or would ultimately run the risk of

5    depriving the defendant ultimately of his due process right to

6    a fair trial.

7            Now what I would say is that with respect to the case

8    that so holds, *Leka* is probably the best case on point.  And

9    the reason that I say that is in *Leka*, what the Second Circuit

10   found in reversing the district court's decision, is that the

11   failure of the prosecution to actually give the name of the

12   witness until just before trial; the failure of the prosecution

13   to disclose exactly what the witness saw, instead of just the

14   general proposition that he can't make an identification, that

15   that deprived the defense of his rights -- the defendant of his

16   rights under *Brady*.

17           And, again, the reason that it makes sense here when

18   we look at the totality of the circumstances that we have

19   presently -- and this goes kind of to the third question which

20   your Honor alluded to at the beginning of do we look at this

21   from the appellate retrospective standpoint --

22           THE COURT:  Yes.

23           MS. ALDEA:  -- or do we look at it from the

24   standpoint of where we're standing today?  I can't tell you.  I

25   mean, in some ways I'm arguing with one hand tied behind my

24

1    back.  I don't know what the statements say.  I'm grateful that

2    the government has agreed to provide the statements to your

3    Honor for *in camera* review and confident that you'll look at

4    them, in light of everything we're discussing here today and

5    make the determination of whether they should be disclosed the

6    determination of materiality.  But I am arguing with one hand

7    behind my back because I don't knows what the statement says.

8              THE COURT:  That's the very true.  Right.

9              MS. ALDEA:  The second part of it is that we're

10   all --

11             THE COURT:  Assuming that the basis for the

12   government's disclosure was a statement or statements.

13             MS. ALDEA:  Correct.  Assuming.  And I'm making that

14   assumption.

15             Now, there is something that the government said in

16   one of its disclosures that actually suggested that it was a

17   statement, which is part of the reason that I'm making -- I'm

18   drawing that assumption.

19             THE COURT:  Sure, no, I understand.

20             MS. ALDEA:  Now, the second part of it is, the other

21   reason I have one hand tied, I guess, more tightly behind my

22   back, is because in this case -- and this is something that all

23   of us share, we don't have the benefit of a retrospective

24   analysis, the benefit of hindsight, to say what impact did this

25   ultimately have on the prosecution of this case and on the

 1    defense in this case.

 2              So all we have -- and this is what the Second Circuit

 3    in *United States versus Coppa* actually instructed trial courts

 4    to look at -- the Second Circuit said, look, all you can do is

 5    look at the circumstances that are available.

 6              Now, in this case, here are the circumstances and

 7    that's why the disclosure is so important.  In this case, we

 8    have witnesses, some of whom don't live in the country.  In

 9    this case, we have people who are transients, who are going to

10    be difficult to locate.  In this case, we have a situation

11    where the longer we wait, the more likely it is that the leads

12    that the defense can follow and the leads that the defense can

13    obtain, will disappear.

14              THE COURT:  But what you have is you have the

15    information your client wasn't present when these three

16    individuals were shot.  So you have that lead.  You have that.

17    And so if you want to interview people you are worried are

18    going to leave the country or going to actually have health

19    issues, or whatever it is, you've got what you need to say,

20    okay, where were you?  Was our client there?  Where was he?

21    Where did he go?  I mean, you have to that.

22              So whether or not you know the source, assuming,

23    again, that it's based on statements of this information, you

24    have what the source is telling the government.

25              MS. ALDEA:  Well, we have -- all we have -- we don't

1    necessarily have everything the source is telling the

2    government.  What we have is he wasn't there.  I don't know if

3    the statement includes additional information.  Your Honor can

4    make that determination as to how the person knows he wasn't

5    there; how the person knows that he left; why the person has

6    this information.

7              THE COURT:  You have the key fact.  And at the end of

8    the day, you have enough to go talk to people who you think

9    might be witnesses that would corroborate that fact; who would

10   know where he was.

11             But let's step back for a second.  So we mentioned

12   that there are two layers to this.  There is what you want to

13   be able to tell the Justice Department capital review folks and

14   of course the trial right.

15             *Brady* is all about enlightenment; right?  *Brady* says,

16   if the government has information that can help your client, as

17   to guilt or punishment, and it's uniquely in possession of the

18   government, then it has to tell you as a matter of

19   Constitutional law.

20             MS. ALDEA:  Right.

21             THE COURT:  To enlighten you so you can then pursue

22   those leads.  So there's a couple layers to that.

23             One is it has to be uniquely within the government's

24   possession, right, because -- let's say it turns out it's

25   material to your defense and it was raining the night of the

1    incidents in question and, okay, the government might know that

2    it wasn't raining and that could be *Brady*, but you could find

3    that out yourself.  That's not something that's uniquely within

4    the possession of government.  So the government has no

5    obligation to enlighten you.

6            Here, the object of the enlightening, here being the

7    Justice Department Review Committee, is you want to be able to

8    enlighten them about things that are mitigating factors that

9    they should consider and, therefore, not authorized the death

10   penalty be sought here; right?

11           MS. ALDEA:  Correct.

12           THE COURT:  So if the government has the information

13   that Ms. Comey has about the fact that your client wasn't there

14   when the three individuals were shot, how are you going to

15   enlighten them when they tell you what they know about where he

16   was?

17           MS. ALDEA:  Well, again, I'm not sure exactly what

18   they know but --

19           THE COURT:  Whatever they know, they know.

20           MS. ALDEA:  Correct.

21           THE COURT:  So you're not going to add to that.

22           Having them say, here are the following sources of

23   the fact that we acknowledge Mr. Tartaglione wasn't present

24   when these three individuals were shot, so you can then

25   regurgitate that back to them --

28

1           MS. ALDEA:  No, it would be --

2           THE COURT:  -- so, here's what we know?

3           MS. ALDEA:  No.  It would be so that we can conduct

4    an investigation; speak to those witnesses; speak to people

5    that might have known that; speak to people that they might

6    have spoken to --

7           THE COURT:  To say that he wasn't there.

8           MS. ALDEA:  No, to get information about -- so if he

9    wasn't there, not being there is one thing.  That still allows

10   the government to proceed with their case that he may somehow

11   be responsible.

12          THE COURT:  Right.

13          MS. ALDEA:  However, the person who knows that he

14   wasn't there also knows what he said before he left.  The

15   person who knows that he wasn't there --

16          THE COURT:  Right, which they -- if they presumably

17   have talked to that person or people.  I mean, that's my point,

18   is that whatever you could find out from this person, assuming

19   you can even talk to this person or people, they've done that.

20   And so I don't know what you're adding, what enlightenment

21   there is to the capital punishment.

22          MS. ALDEA:  Yes.  I understand your question.

23          So here's the difference.  When a prosecutor asks a

24   witness questions, the reasons for asking the questions is to

25   get proof or evidence of guilt.  In other words, the questions

1  are directed -- people answer the questions that they're posed.

2  I'm not using that as an aspersion --

3          THE COURT:  Let's back up for a second.

4          MS. ALDEA:  Yes.

5          THE COURT:  But I think we should give prosecutors a

6  little more credit.  Presumably the prosecutors ask people

7  questions to find out what happened.

8          MS. ALDEA:  Correct, your Honor.  I was a prosecutor

9  for 15 years, I do give credit, I do.

10          THE COURT:  So you know, your job was to find out

11  what happened.

12          MS. ALDEA:  Absolutely.

13          THE COURT:  Okay.

14          MS. ALDEA:  However, people answer the questions that

15  they're posed.

16          THE COURT:  Yes.

17          MS. ALDEA:  So when the prosecutor early on in the

18  investigation of the case with the information available to the

19  prosecution, which does not include information that is

20  available to the defense that we can get from our own client,

21  for instance, which prosecution is not entitled to, the

22  prosecutor is asking questions that are directed towards

23  certain events.

24          People have a tendency -- and, in fact, we all know

25  this to be true -- to answer only what they're asked and to not

1    give additional information.  It happens all the time; happens

2    with witnesses on the stand, with police officers who say, I

3    didn't write that down, I didn't talk to him.

4            THE COURT:  How many times have you said, objection,

5    that's beyond the scope of my question or nonresponsive to my

6    question?

7            MS. ALDEA:  Sure.

8            THE COURT:  I mean, come on.  People answer questions

9    that go beyond the scope.

10           MS. ALDEA:  It happens.

11           THE COURT:  But in any event -- so the scenario

12   you're imagining is the Constitution entitles you to cross

13   examine the government's witnesses before the Capital Review

14   Committee does its job?  And if that's the right, then why is

15   it limited just to something that might be *Brady* material?  Why

16   wouldn't be it be -- well, the prosecutors don't really know

17   what questions to ask, so there may be all kinds of leads that

18   are being lost because we don't get access to the government's

19   witnesses, so we want access to the cooperators and other

20   eyewitnesses before the capital -- why?  Why not?

21           MS. ALDEA:  This isn't a fishing expedition, your

22   Honor.  This is just -- and I'm not claiming that we're

23   entitled to one.  There has to be material -- the information

24   that we're seeking has got to be material to guilt or

25   punishment.

1          With respect to the Capital Review Board's

2     determination.  It's relevant to guilt.  Now, factors that are

3     relevant to guilt include whether the defendant is punishable

4     as a principal, which is what we're dealing with here.

5          It includes whether he couldn't reasonably have

6     foreseen that his conduct in the course of the commission of a

7     murder would cause or create a grave risk of death.

8          And, again, I'm reading all of this from that same

9     case that basically said you're entitled to this information

10    prior to the decision of whether to seek to the death penalty.

11         THE COURT:  But that doesn't entitle you to cross

12    examine the government's witnesses.

13         MS. ALDEA:  It's not about cross examination, it's

14    about investigation.

15         THE COURT:  But to cross examination by asking their

16    witnesses questions.  You honestly think you have a right to

17    access to the government's witnesses at this stage of the case,

18    to ask them questions?

19         Is that who you think the Constitution entitles you

20    to?

21         MS. ALDEA:  I do think that that is the case when --

22    well, again, I have to draw the distinction between what your

23    Honor is authorized to do and has the discretion to do and what

24    I'm absolutely entitled to.

25         THE COURT:  But hang on.  Let's get back.  This is

                 Angela O'Donnell, RPR, 914-390-4025

1      about your client's *Brady* right.

2             MS. ALDEA:  Correct.

3             THE COURT:  I mean, discretion is not a license to do

4      something that's lawless.

5             MS. ALDEA:  Well, correct.  No, your Honor.

6             THE COURT:  Okay.

7             MS. ALDEA:  So the *Brady* right deals with the fact

8      that this is -- to separate it out.  If it is material to guilt

9      or punishment, and if it is exculpatory, then there is a right

10     to it under *Brady*.  The question of whether I am entitled to it

11     now, at this stage, prior to the decision of whether to seek

12     the death penalty is a question of discretion.

13            In other words, there is no -- *Brady* material, as the

14     government has pointed out in their papers, it's the bulk of

15     their submission, is not going to constitute a violation unless

16     there's prejudice.

17            So, in other words, to rise to the level of a due

18     process violation, which is separate from the issue of whether

19     it is exculpatory, whether it has bearing on guilt or innocence

20     or has exculpatory information, the government has pointed

21     out -- and I agree with them -- that it doesn't rise to the

22     level of a constitutional *Brady* violation and, therefore, not a

23     constitutional *Brady* obligation, if it's ultimately not going

24     to violate due process.  But that's why I keep drawing this

25     distinction.

1              That's why all these of cases that have held that, in

2       fact, this information should be disclosed prior to the

3       decision of whether to seek the death penalty --

4              THE COURT:  No, no, no.  This information is where I

5       think you're over -- you're generalizing.  Because the

6       information, the information is your client wasn't there when

7       these three individuals was shot.  You know that.  They've told

8       you that.

9              The idea that you're going to somehow enlighten them,

10      because they know the basis for that statement; right?

11      Whatever it is, they know the basis for it.

12             So you're just basically asking to have access to

13      their witnesses to tell them what they already know and so --

14             MS. ALDEA:  Your Honor.

15             THE COURT:  Let me back up for another second.

16             We've glided past the uniquely in the possession of

17      the government.  The information that you're saying is *Brady* is

18      where your client was when these three individuals were shot.

19      Okay?  Right?  He wasn't there.

20             MS. ALDEA:  Correct.

21             THE COURT:  So that's not uniquely in the possession

22      of the government, because your client knows where he was when

23      these individuals were shot.

24             So I don't understand how the government is uniquely

25      in possession of information about where your client was when

1   he knows where he was and you can ask him.

2          MS. ALDEA:  Right.  But that's not what we're arguing

3   about, because that's the *Brady* information they've already

4   disclosed to us.

5          So what this argument is about, so they've already

6   said, under our *Brady* obligations, we told you he wasn't here.

7          THE COURT:  Right.

8          MS. ALDEA:  What we're saying is *that Brady*

9   encompasses more than what you've already givens us.  *Brady*

10  encompasses the context so that we can actually conduct an

11  investigation and meaningfully use that statement.

12         THE COURT:  If you want to know -- hang on.  The key

13  fact is he wasn't there.  That's the key fact.  And wherever he

14  was, whatever he was doing, whatever he counsel, commanded or

15  advised or didn't -- let me read you a quote from the Second

16  Circuit case, because that's the one I listen to.

17         *US versus Diaz*, and it says, Araya, A-R-A-Y-A,

18  testified at trial that Diaz was not in her apartment during

19  the May 16, 1989, transaction with Mario.  *Diaz* did not learn

20  that she would so testify until the trial and contends that the

21  nondisclosure of this fact by the government breached its

22  obligations under *Brad*y to inform him of Araya's planned

23  testimony sooner and that he was thus entitled to a mistrial.

24  His argument is frivolous.  First, there was no improper

25  suppression within the meaning of *Brady* when the facts are

1    already known by the defendant.

2          I don't understand what fact you don't know.  The

3    fact that you might want to do investigative leads with this

4    fact, that's fine, have at it; but the fact that your client

5    wasn't there is something he knows about, and the fact that --

6    let's assume it's a government cooperator, or a government

7    eyewitness, not a cooperator, who is going to testify as Araya

8    did in this case, Second Circuit says it's not a *Brady*

9    violation, because it's not information that's uniquely in the

10   government's possession.

11         MS. ALDEA:  Except the Second Circuit in *Leka* said

12   that even though the information was in the possession of the

13   defense attorney prior to trial, nonetheless, the absence of

14   the context and the absence of the witness' name in that case,

15   wound up constituting a *Brady* violation, because it's fact

16   specific, because you always have to put it in the context of

17   what it is that ultimately the defendant is deprived of.

18         THE COURT:  No, you don't.  This is a fact that is

19   uniquely known to your client.

20         MS. ALDEA:  But it's not that fact that we're arguing

21   about.  That's, I guess, the problem.  The people -- the

22   people.  I'm sorry, the government -- has already said that

23   they have an obligation under *Brady* to tell us that fact.

24   Okay?

25         What they've given us is a fact we already knew.  We

Angela O'Donnell, RPR, 914-390-4025

1   already knew that he wasn't there during the murders; right?

2   So that's what they have disclosed to us.

3            THE COURT:  So I don't know what we're arguing over.

4            MS. ALDEA:  What we're arguing about is the

5   information -- so he wasn't there, so as a result, he doesn't

6   know what happened during his absence.  He doesn't know what

7   happened when the witnesses were shot.

8            THE COURT:  You're not entitled to a preview of the

9   government's case, and if there's anything else that's

10  exculpatory about his absence, the government has to tell you

11  that.

12           MS. ALDEA:  But the people who were there, and the

13  people who know that he was not present, the people who know

14  that he didn't participate in the shooting, the identity of

15  those people who gave that information to the government, those

16  are the people we can speak to in the exercise of our ethical

17  obligation to investigate the case.  The obligation of --

18           THE COURT:  In other words, you are entitled to

19  access to the government's witnesses, even at this stage of the

20  case.  Because, by that theory, you should be allowed to

21  explore every lead that could be helpful to your client.

22           MS. ALDEA:  Well, your Honor, we need to at least

23  know the statements that were made.

24           THE COURT:  Why?

25           MS. ALDEA:  Because, if we don't know the statements,

1    then we're lacking the context to be able to --

2              THE COURT:  The context of your client wasn't there?

3              MS. ALDEA:  To be able to use that information in a

4    way that will benefit, first, the question of whether the death

5    penalty should be sought, and second, the question ultimately

6    of his guilt.

7              THE COURT:  Okay.

8              MS. ALDEA:  And finally the question of punishment --

9              THE COURT:  Anything else?

10             MS. ALDEA:  -- later on.

11             Can I just have a minute?

12             THE COURT:  Of course.

13             MS. ALDEA:  Thank you.

14             So, your Honor, I guess Mr. Barket crystallized what

15   I was trying to say on this point.

16             THE COURT:  Okay.

17             MS. ALDEA:  And so it's a little bit repetitive what

18   I said, but it crystallizes it.

19             The difference is this.  As I said before, what the

20   government doesn't know when its interviewing these witnesses,

21   but the defense does know if it had access to the information.

22   We have access to what our client knows.  We have access --

23   we're looking at it, I think the paraphrase was a single-minded

24   devotion of the defense attorney who is looking to exculpate

25   the client.

1              THE COURT:  Of course.

2              MS. ALDEA:  Who is looking to investigate every lead.

3              THE COURT:  Sure.  Of course.

4              MS. ALDEA:  The government is not looking at it from

5     that perspective, and that's not to fault the prosecutors or

6     claim that they're not looking for the truth, but it's a

7     different perspective.

8              When we make a submission to the Department of

9     Justice, arguably, the prosecutor knows all of the information

10    that we're providing in mitigation most of the time anyway.

11    The difference is that our ability to put together the facts,

12    the disparate facts that they may have, with information that

13    we have, can make that disclosure more compelling.  And that's

14    precisely why the court in 2006, the District Court in *United*

15    *States versus Delatorre*, did, in fact, order the government to

16    make these disclosures prior to the Department of Justice

17    submission in this case, particularly because the defendants do

18    have the right, and not only the right, but also has the

19    ability, the unique ability, to argue against the death

20    penalty.

21             Now, the cases that have so held, and there really

22    are a lot of them, and I'll provide the cases, if your Honor

23    would like, all of them with all of the citations post argument

24    to both the prosecution and to your Honor, but the cases, it's

25    *United States versus Delatorre*, it's you *United States versus*

1    *Feliciano.*

2              THE COURT:  *Delatorre.*  I'm sorry.  If you could give

3    me the site of *Delatorre.*

4              MS. ALDEA:  Correct.  *Delatorre* is 438 F.Supp. 2d

5    892.

6              THE COURT:  Okay.

7              MS. ALDEA:  *United States versus Jackson* was the

8    Southern District case, which is 2003 WL 22023972, and that is

9    the one that, in that case, there are multiple other cases

10   cited, which I won't give to your Honor.  There's *United States*

11   *versus Diaz*, 2005, WL 1575191.  That's a 2005 case that says

12   that exigencies of capital litigation compel prompt disclosure

13   of information that will affect choice of penalty; *United*

14   *States versus Feliciano*, is another one, 998 F.Supp. 166,

15   granting a preauthorization request for mitigating evidence and

16   aggravating factors the government intends to prove.  And there

17   are multiple cases actually cited within each of these cases,

18   which is why I say there are dozens.

19             So the proposition, the government put in its

20   submission that, in fact, the quote was that a request for

21   *Brady* material for this purpose has no legal basis and they

22   cited two cases from 1996, two district court cases, that are

23   not even directly on point.  There's ample authority for the

24   proposition that the district court not only has the authority

25   to issue this disclosure, but that this is particularly

Angela O'Donnell, RPR, 914-390-4025

1    compelling in a capital case.  Obviously, I mean, that's what

2    we're dealing with.  But also that this is a requirement under

3    heightened due process, under the correct circumstances.

4            So it's all about the circumstances.  So the only

5    other thing I would add to all of this --

6            THE COURT:  Yes.

7            MS. ALDEA:  -- is on the third point, which has to do

8    whether the disclosure should be now or later, just in terms of

9    what I understand.  We're not actually arguing about that much

10   substantively here, I think, because the government has, in

11   fact, said, look, we're going to provide you all this

12   information.  We're going to tell you who the witnesses are who

13   made these statements.  Assuming that there are statements.  As

14   your Honor said, I don't know that, but assuming that there are

15   statements.

16           We're going to give you the specific statements, but

17   we're going to do it on a schedule, on a closer schedule right

18   before trial.  So there isn't a question as to whether or not

19   we're going to get the information.  The question is when we

20   get the information.  That's what all of this is really about.

21           THE COURT:  That's always true.

22           MS. ALDEA:  Correct.

23           THE COURT:  But then what you're saying is the *Brady*

24   right now gets conformed into a discovery right where you get

25   the prosecution's files.

1          MS. ALDEA:  No, your Honor.

2          THE COURT:  Yes, it absolutely is.  Because -- or at

3    least the key parts of their file.  You want access, again, on

4    the assumption that this information comes, even exclusively

5    from cooperators, and it doesn't, then you get access to them.

6    You get access to them right after the case is indicted,

7    because the sooner the better; especially if the capital review

8    process, obviously, is at the front end of the life of the

9    case.

10         MS. ALDEA:  Well, your Honor, we don't get access to

11   the entire file.  That's for sure.  The only portions of the

12   file that we would get access to is the information that is

13   exculpatory and the context of that information.  In other

14   words, the person who made the declaration and the specific

15   statement, rather than the Government's paraphrasing of it.

16   That's our argument.  So it's not that we have open file, we

17   get access to everything that was said.

18         THE COURT:  You get access to the crown jewels.  If

19   you got a choice, you'd say -- you can have the cooperators or

20   you can have the telephone logs.  I'll take the cooperator, and

21   500.

22         MS. ALDEA:  Well, okay, but I get the crown jewels.

23   I mean, I guess that in this capital defense the crown jewels

24   to us are what's exculpatory.  That's what we're interested in.

25         THE COURT:  No, no, no, no.  See, but you have what's

1   exculpatory.  You have what's exculpatory.  What you want to

2   know is whether you or not you can fish out more that's

3   exculpatory, because you have the essential fact.  And beyond

4   that, you have the number one source of where your client was

5   when these murders took place; your client.  So you have that.

6   And you can pursue any lead you want with that.

7          What you want to know is why the government still

8   thinks he's guilty.  And you don't get that.  You don't get

9   that under *Brady*.  You don't get it under due process and you

10  sure as heck don't get it under my discretion.  There's no case

11  law that supports that notion.

12         MS. ALDEA:  We don't want to know why they think that

13  he's guilty.

14         THE COURT:  Yes, you do.  Yes, you do.  You want to

15  know what the theory is as to why they still think he's guilty

16  and he still should be eligible for the death penalty, so you

17  can poke holes in those theories.

18         But what you don't get to do is try the case several

19  times.  You don't have a single case, not a single case, that

20  says there's a *Brady* right to access to a government cooperator

21  or government eyewitnesses who otherwise have provided

22  information that the government's provided to you in terms of

23  the key exculpatory fact.  Again, assuming any of this is

24  exculpatory.  Because it's not if the government's theory is

25  that he wasn't there.

                Angela O'Donnell, RPR, 914-390-4025

1          You are saying, well, there might be other things the

2     government hasn't thought of because they're wearing the

3     prosecution hat and not the defense hat.  That's true of every

4     single criminal case.  And the *Brady* right is not elastic

5     enough to say, we don't trust prosecutors to the point where we

6     think the prosecutors have to turn over their cooperators to

7     the defense, or their other witnesses to let them have a go at

8     it.  There's no law for that.

9          MS. ALDEA:  That is true, your Honor, however, what

10    is not true is that there's no case that says that in this

11    context we're entitled to the material.  There are cases that

12    say that.  *Leka* is a case where --

13          THE COURT:  *Leka* is a case involving inconsistent

14    eyewitness testimony.  That's not this case.  There's nothing

15    in the record of this case, including the material I reviewed,

16    that remotely suggests that there's any inconsistency.

17          So you keep relying on *Leka* and *Leka* is not this

18    case.  *And Diaz* says what it says about what's exculpatory,

19    when information is in the possession of the defendant about

20    where the defendant was and an argument that the government's

21    fair to tell about what its witness is going to say about where

22    the defendant was was frivolous.  That was when the person

23    testified at trial in a way that revealed the defendant's

24    absence from a key drug deal.  *Diaz* is still good law.

25          MS. ALDEA:  Well, *Zambrana* was a case that actually

1    was that as well with respect to a witness that actually wound

2    up giving information that showed that even though the

3    defendant was involved, which was the government's theory of

4    the case, nonetheless, the defendant wasn't directly -- didn't

5    participate in an individual transaction.

6            THE COURT:  Yeah.

7            MS. ALDEA:  And the court found that that was

8    exculpatory and that that constituted *Brady* material as well.

9            THE COURT:  And if that had been this case, then the

10   fact that he wasn't there was a fact -- the equivalent fact in

11   the case you've been told.  So that's the problem is that the

12   information to which you are entitled, you've been given.

13           What you want is to try to do more with that

14   information, and you can do what you need to do with that

15   information.  That doesn't mean you get access to the sources.

16           By the way, assuming you don't have access to the

17   sources are ready, you don't get to then say, we'd like to talk

18   to the eyewitnesses who are the source of that.

19           Because, by the way, if the source of the basis for

20   this disclosure was what's already in the discovery, then

21   there's your leads.

22           MS. ALDEA:  Well, except in *United States versus Gil*,

23   the court found that, if there is exculpatory information that

24   has been provided to the defense and it's buried within a

25   packet of discovery and not highlighted, then that does not

                    Angela O'Donnell, RPR, 914-390-4025

1      provide the defense meaningful opportunity --

2              THE COURT:  Right.  But let's be honest.  It's not

3      hard to figure out which, among these categories of discovery,

4      you have been given where you might find information that tells

5      you what you already know from your own client.  Okay?

6              MS. ALDEA:  That part I have to defer to co-counsel

7      on, because that goes to the factual review.  My involvement in

8      the case so far has been limited to this issue --

9              THE COURT:  Yes.

10             MS. ALDEA:  -- so I could defer to Mr. Barket on the

11     question of what we can glean and what we can't.

12             THE COURT:  Of course.

13             MS. ALDEA:  But the reason that I keep going back to

14     *Leka* is not for the proposition of what the information was in

15     that case.  I go back to it for the proposition that even when

16     the defense has a particular source, a particular piece of

17     information, part of the analysis in *Leka*, and part of the

18     prosecution's argument, was that the defense, in fact, already

19     had all the information available to it before trial started.

20     But the Second Circuit said, yeah, and you know it's nice to

21     fault counsel for the fact they didn't use it most efficiently

22     at the time that we were on the eve of trial and there were 23

23     days left till the defense case, but the timing of when that

24     was given under the circumstances of that case rendered it

25     unusable.

46

1          THE COURT:  But if the exculpatory information in

2    *Leka* that was revealed by this off-duty cop, the equivalent in

3    this case you have been provided that information.

4          MS. ALDEA:  Perhaps --

5          THE COURT:  So if the off-duty cop said to Ms. Comey

6    what the person was revealed to have said nine days before the

7    trial, Ms. Comey has revealed that information now.  So *Leka*

8    doesn't say that somehow if this had been provided in the early

9    stages of the case, it still would have been a *Brady* violation.

10   *Leka* says it didn't give the defense enough time to make use of

11   it so close to trial.

12         We don't even have a trial date yet.  So the *Leka*

13   equivalent of *Brady* material in this case has been disclosed.

14         MS. ALDEA:  Well, actually, not.  So the defense had

15   the information that the witness can't testify at trial, which

16   is what is equivalent here.  What was missing in *Leka* was the

17   witness' name in a timely way.

18         THE COURT:  No, what was missing was the fact that

19   the testimony was inconsistent about the fact that it could not

20   have happened, right, because he saw it from the second floor,

21   and that was inconsistent with the other two witnesses.  That

22   is what was exculpatory.

23         The equivalent information in this case you have been

24   provided.  So *Leka* doesn't help you here.  It just doesn't.

25         *Leka* doesn't say that the prosecution was required to

                Angela O'Donnell, RPR, 914-390-4025

1    give over what you're saying you're entitled to here.  *Leka*

2    says that the prosecution was required at an earlier stage of

3    the case to reveal the exculpatory information.

4           MS. ALDEA:  *Leka* says more broadly, just in general,

5    that you look under the specific circumstances of the case to

6    determine whether the information that the defense is afforded

7    is sufficient to allow the defense to meaningfully use it.  So

8    we cannot meaningfully use the statement, which, by the way, we

9    already knew that he wasn't present.

10          What we can meaningfully use, as part of our duty to

11   investigate the case and to provide compelling arguments to the

12   prosecution in favor of mitigation, or in favor of -- well, to

13   the government it would be in favor of mitigation.  What we

14   don't have is the context and what we don't have is the

15   identity of the people who made the declarations.  And that, I

16   would argue, under these specific -- under this specific case,

17   the circumstances here is what we need to make the disclosure

18   meaningful.  It is an exculpatory disclosure.  That's why the

19   people turned it over.

20          So when we argue about the fact that it's not

21   exculpatory at all because it's part of their theory of the

22   case, that's belied by the disclosure.  The question now is is

23   the content of the disclosure --

24          THE COURT:  That's not true.  We tell prosecutors,

25   even if you don't think it's *Brady*, if you think someone could

Angela O'Donnell, RPR, 914-390-4025

```
 1    regard it as Brady, you make sure to turn it over.

 2             MS. ALDEA:  Sure.

 3             THE COURT:  And we want them to do for obvious

 4    reasons.

 5             MS. ALDEA:  Sure.

 6             THE COURT:  But to the extent that the government's

 7    theory, as you say, has evolved of the case, what might have

 8    appeared to be Brady back in May, may not be Brady now going

 9    forward.  I don't know.  But the bottom line is that, whatever

10    you think is exculpatory, and we are going round and round,

11    they provided it, you want more, and the question is, what's

12    the basis to that entitlement?  I get it.  I understand the

13    point.

14             MS. ALDEA:  All right.  Thank you, your Honor.

15             But can Mr. Barket just address the second portion of

16    your Honor's --

17             THE COURT:  Of course.  Yes.

18             MR. BARKET:  There's been a good deal of discussion.

19    I forgot the precise question that your Honor asked where

20    Ms. Aldea looked at me.

21             THE COURT:  This whole thing is based on the

22    assumption that the basis for the government's disclosure comes

23    from witness information.

24             MR. BARKET:  Well, it comes from something; right?

25             THE COURT:  It comes from something.
```

1          MR. BARKET:  We started off with a factual basis for

2    our conclusion that Nick wasn't present when these people were

3    shot, because that's been Nick's position from the moment he

4    was arrested.

5          THE COURT:  Yes.

6          MR. BARKET:  Our factual basis for it is Nick.  Their

7    factual basis, I presume, is not the defendant said he wasn't

8    there.  I presume their factual basis is something else.

9          THE COURT:  Yes.

10         MR. BARKET:  And the factual basis is what we're

11   after.  The conclusions, we agree upon.

12         THE COURT:  Yes.

13         MR. BARKET:  Just in the simple example, if there is

14   an alibi in this case -- I'm not sure that there is or there

15   isn't, but suppose Nick had an alibi and said I was someplace

16   else at the time of the crime, and he didn't know that there

17   was an unknown witness to him that was present as well.  Well,

18   that unknown witness would certainly be exculpatory and *Brady*

19   would have to be disclosed, because it would be a much more

20   powerful presentation to a jury, to a fact finder to a

21   decision-maker, that not only does the defendant say he wasn't

22   present, but also another objective third-party witness does.

23         So when we get to the point where we're arguing that

24   Nick is not responsible for the crimes here at all --

25         THE COURT:  Yes.

1          MR. BARKET:  -- we don't want to rely just on what

2     Nick says, as much as we may subjectively believe him, we want

3     the underlying facts that the government has to come to the

4     same conclusion.  That's what we'd want to be able to put

5     before the jury or a decision-maker beforehand.  We want to be

6     able to say, here are the facts that happened.

7          So when your Honor says we have the information

8     already, what you're saying is we have the conclusion already.

9     We don't have the information.

10          The conclusion we've had from the beginning.  The

11     facts, the underlying sources of that conclusion, is what we're

12     the striving to obtain.

13          And would I like a preview of the case?  I mean, you

14     don't know me well, but you know me a little bit, yeah, I'd

15     like it all.

16          THE COURT:  Everybody in your position would want --

17          MR. BARKET:  Of course, but that, legally, we know

18     we're not entitled to.

19          What we think we're legally entitled to is the

20     exculpatory part of that crown jewels, the part where -- so

21     powerful, that it led the government to conclude the same thing

22     that our client told us on December whatever the date of his

23     arrest.  And if you think about how powerful that is, right, he

24     was arrested that day.  It was a horrible view of the case on

25     the day of his arraignment and in the months that followed.

1          It's now evolved where the government has come

2     towards our conclusion.  We want to know what those underlying

3     facts are:  How did that happen?  Why did that happen?  What

4     are the sources of that?

5          And that is *Brady* material.  That's exculpatory.  And

6     that we need not only for the trial, but also to make an

7     argument to the Department of Justice.

8          When your Honor says that, well, they know what they

9     know, so how are you going to possibly enlighten them, and I

10    know you don't mean to do this, but it diminishes the defense

11    attorney to be meaningless.

12         THE COURT:  No, no, no, no.

13         MR. BARKET:  We become potted plants.

14         THE COURT:  What I was saying was that they know that

15    your client wasn't there and they know why they know that he

16    wasn't there.  What you want is to know why -- how it is that

17    they know so you can tell them what they already know.

18         MR. BARKET:  No, so we can take that information that

19    they uniquely have, couple it with information we have, and

20    make a persuasive case to them.  That's our role.

21         THE COURT:  But all you're going to persuade them of

22    is that he wasn't there.

23         MR. BARKET:  No, no, no, Judge.

24         THE COURT:  Whatever else it is that you think you

25    can persuade them with, you have the information.  You need to

1   go then if there's other leads you want to follow, then you

2   follow it.

3           You don't have a single case in the history of

4   American jurisprudence that says that you're entitled to have

5   access to any eyewitnesses who are the basis of this

6   information.  None.

7           MR. BARKET:  Well, your Honor, I would respectfully

8   disagree with.  The cases that we cite saying that the

9   prosecution or the government has to provide a specificity,

10  facts of the underlying conclusion, are what we're relying

11  upon.  And that's the crux of the argument.  We all agree that

12  the conclusion was disclosed.  We have it.  They now come to

13  it.

14          THE COURT:  This isn't a conclusion, Mr. Barket.  A

15  conclusion is so you say here are the facts, therefore, act.

16  This is a fact; your client wasn't there.

17          MR. BARKET:  Well --

18          THE COURT:  Hang on.  Please don't interrupt.

19          MR. BARKET:  I'm sorry.

20          THE COURT:  Your client wasn't there when these three

21  individuals were shot.  That's a fact.  That's not a

22  conclusion.

23          MR. BARKET:  It is a fact because witnesses'

24  information led them to that fact, to a conclusion.  It becomes

25  a fact based upon --

1          THE COURT:  The conclusion is, is he guilty or not?

2    You're saying that may lead to the conclusion he's not guilty.

3    Fair enough.  But the fact that he wasn't there, you have been

4    told by the government.

5          MR. BARKET:  We don't -- we are not being given the

6    underlying basis for that.

7          THE COURT:  You're not entitled to that.  There's

8    no -- I don't understand -- I still -- we've been at this for

9    an hour plus, and I still don't understand how you think you

10   have a *Brady* right to know the basis of what the government has

11   told you by way of information.  Because, why, because you

12   think you can cross examine their cooperators or their

13   eyewitnesses better, because when they asked them questions,

14   they only answer the questions they were asked, and you can ask

15   better questions that will lead to enlightenment.

16         MR. BARKET:  No.  I mean, your Honor, with all due

17   respect, that's not our position.  Our position is that we are

18   entitled to the specificity, which is the underlying basis of

19   what you described as a fact, what I describe as a conclusion,

20   and we cited cases to that effect.

21         THE COURT:  Actually, no, you cited -- you quoted

22   some today.  You didn't cite to me in your letters.

23         MR. BARKET:  Oh, I think we --

24         THE COURT:  You cited some.  I read those, but

25   they're not binding and they're not helpful, to be honest with

 1  you.

 2          MR. BARKET:  Well, to the extent that they're not

 3  helpful, I mean, kind of --

 4          THE COURT:  They're not helpful because they don't

 5  describe the facts and circumstances in this case.  That's why

 6  they're not helpful, with all due respect.

 7          MR. BARKET:  But then they can't describe the facts

 8  and circumstances of this case.

 9          THE COURT:  And that's why they're not helpful.

10          MR. BARKET:  But the specificity, the point is that

11  you can't simply say and fulfill your *Brady* obligations by

12  saying your client wasn't there and not disclose, in our view,

13  and not disclose the underlying basis for that.  And it is a

14  conclusion.  It's a conclusion based upon a series of facts.

15          THE COURT:  No.  It's a fact.  It's a fact.

16          If somebody says Mr. Barket was in this courtroom at

17  this time, that's a fact.  If someone says Mr. Rico was not in

18  the courtroom at this time, that's a fact.  Those aren't

19  conclusions.

20          MR. BARKET:  Right.  But those facts are made up of

21  witnesses and records --

22          THE COURT:  Or other information.

23          MR. BARKET:  Or other information.

24          THE COURT:  Right.  So they are still facts.

25          MR. BARKET:  To which we're entitled.

                Angela O'Donnell, RPR, 914-390-4025

1              THE COURT:  You have that fact --

2              MR. BARKET:  We don't.

3              THE COURT:  -- that he wasn't there.  You have the

4    fact he wasn't there when the three individuals were shot.

5    What you don't have is basis for that.

6              MR. BARKET:  Fine.

7              THE COURT:  Okay?

8              MR. BARKET:  Right.

9              THE COURT:  And once again, we're going round and

10   round, but okay.

11             Anything else?

12             MR. BARKET:  No.

13             MS. ALDEA:  But your Honor one last --

14             THE COURT:  Sure.

15             MS. ALDEA:  Just the cases.

16             THE COURT:  Yes.

17             MS. ALDEA:  These aren't cases I cited to you today,

18   these are from the submissions.  So this is actually from the

19   submission.

20             Your Honor says there's no case that would require

21   actually turning over the witness statements, the substance of

22   the statements themselves, rather than just the information and

23   the identity.  And so reading from the submission in this case,

24   this is from the October 24th reply at the bottom of page 4, it

25   begins:  *United States versus Taylor* was a case, an Eastern

1    District case from 2014, that talked about pursuant to *Coppa*,

2    district courts have uniformly recognized the discretion to

3    order *Brady* disclosure at any time as a matter of sound

4    management.

5            The cases that follow answer directly your Honor's

6    question.  So the first one, *United States versus Jacobs*, which

7    is a Connecticut case from 2009, ordered immediate disclosure

8    of co-conspirator statements in a drug prosecution and held

9    that the prosecutor statements that these relevant statements

10   would be disclosed in accordance with the Jencks Act was

11   inadequate.  The prosecutor intended to call the

12   co-conspirators as a witness during trial.  The duty to

13   disclose under *Brady* trumped the duties under the Jencks Act.

14           Similarly, *United States versus Lino*, that's a

15   Southern District case from 2001, directed the government to

16   produce the defendants immediately any written or oral

17   statement, including statements recorded in investigative

18   meeting notes by any witness the government anticipates calling

19   in its case in chief, et cetera.  And you can read the rest.

20           THE COURT:  Right.  And so the problem you have with

21   those cases is, I agree with those cases, and my individual

22   trial practices, the government doesn't turn over its Jencks

23   material pursuant to Jencks.

24           MS. ALDEA:  Correct.

25           THE COURT:  I've never followed that.

1          So, in other words, after the direct testimony of

2     their witnesses.  Not only that, I don't let the government

3     wait until the Friday before the witness testifies to turn over

4     this material.  They turn it over sometimes weeks or months in

5     advance in this courtroom.  All right.  So you're going to get

6     disclosure of this information in a far more meaningful way

7     than Jencks would ever otherwise give you.  But those cases

8     don't support the notion here, that after being provided with

9     the exculpatory information -- these are also generic orders

10    where you have to make sure you provide exculpatory information

11    and otherwise provide the witness statements in advance before

12    Jencks would require the government to do that.  All that's

13    going to happen here.

14          So I don't know see how these cases support the

15    notion that you should get access to the witness statements or

16    the witnesses themselves, especially if there are security

17    issues with these witnesses.  I don't know.

18          MS. ALDEA:  Correct, your Honor.

19          THE COURT:  But if there are, there's plenty of case

20    law that says that they get to rely on that to not give you

21    access to who the witnesses are.  It may be that the content of

22    the witness' statements themselves will reveal who they are.

23          MS. ALDEA:  Well, your Honor, I absolutely agree with

24    that proposition 100 percent; however, the government has not

25    argued that there's any reason to not provide disclosure at

1    this time, or because of witness safety or other concerns.

2    That's simply not an application that was made here.

3           If that application is made, and your Honor credits

4    that application, no question, and all of these cases so hold,

5    but these cases *Lino*, *Gatto*, these other cases, *Jacobs*, they're

6    not just general orders, they are cases that actually compelled

7    immediate disclosure.  Immediate disclosure upon the request

8    being made well before trial, well before even -- I'm not sure

9    whether it was in the context of before the decision to seek

10   the death penalty was imposed in these cases, which is why I

11   cited the new cases.

12          THE COURT:  Yeah, I don't remember that either.

13          MS. ALDEA:  That I don't.  But these are cases that

14   immediately talk about immediate disclosure.  And, in fact, in

15   *Coppa* itself, which is interesting.  *Coppa* was a Second Circuit

16   case that actually reversed a decision by a Southern District

17   Judge, I believe, who ordered immediate disclosure of all

18   exculpatory materials well, well in advance, of trial, well

19   before even what your Honor would set as the schedule pursuant

20   to Jencks.  Said, as soon as the request is made, you need to

21   turn it over.  So well before trial.

22          And when the Second Circuit wound up finding that the

23   judge had exceeded his authority, the Second Circuit said,

24   look, we're not holding, we're not saying that the judge is

25   unauthorized to order disclosure of what it deems to be

1    exculpatory *Brady* material at that stage.  The court has that

2    authority.  The court retains that authority.  But he went too

3    far because he said all material and didn't take into account

4    materiality at all.

5            So the Second Circuit in *Coppa* said that it's a very

6    fact-specific inquiry and you need to look for the purposes of

7    the timing of the disclosure, and whether disclosure very close

8    to trial is sufficient, or whether disclosure, you know, even a

9    month or two before trial is sufficient.  You have to look at

10   the circumstances, which is why I say that under that

11   reasoning, in our case, we have very different facts here.

12           We have witnesses who are going to disappear.  We

13   have witnesses who are transients.  We have witnesses who are

14   potential sources for the government's information here for

15   these statements for this exculpatory material.  If we find

16   out, even pursuant to your Honor's generous schedule, three

17   months or four months or six months before trial, it may be too

18   late for us to conduct a meaningful investigation, because we

19   may no longer be able to locate these witnesses out of the

20   country.  That's the problem that we're facing here.

21           THE COURT:  What's to stop you from talking to these

22   individuals now as part of your investigation?

23           MS. ALDEA:  My understanding is we don't know who

24   they are.

25           THE COURT:  So I just want to be clear on something.

1            There are individuals that you know about their
2   status but you don't know who they are.  And these are people
3   you think are going to testify at trial.
4            MS. ALDEA:  Correct, your Honor.
5            THE COURT:  So, if they're going to testify at trial,
6   what's the problem?
7            MS. ALDEA:  Well, the fact that the government
8   currently has a present intention for them to testify at trial,
9   doesn't mean that they will, and I don't know that all the
10  witnesses that we're talking about are witnesses that the
11  government intends to call.  I don't know, as I said --
12  remember my hand tied behind my back.
13           THE COURT:  Yes.
14           MS. ALDEA:  I don't know the source or the content of
15  the actual information.  All I have is that summary statement,
16  and so just -- in some ways, I mean, it's interesting because
17  my inability to meaningfully articulate why the information is
18  exculpatory, is caused by the lack of information that I've
19  been given.  I don't even have enough context to articulate
20  that.
21           Now, your Honor may be right, maybe it's because it's
22  lacking.  Maybe it's because every other statement that the
23  government has is information that is purely inculpatory.  I
24  doubt that that's the case.  I doubt it only because I think
25  the context will allow us to be able to meaningfully use the

1   one bit of exculpatory information that we have.  But I don't

2   know.

3           So all I can do is provide this background to allow

4   your Honor when you review the material in camera to make the

5   determination of whether disclosure -- again, we're not arguing

6   about whether it will be disclosed.  We all agree that it will

7   be.  We all agree that we're going to get it.  The question is

8   will it be meaningful if we get it just before trial?  And by

9   just before trial, I mean pursuant to the schedule your Honor

10  will set.

11          THE COURT:  Okay.

12          MS. ALDEA:  The last point on that is in *Coppa* itself

13  which is the people's best case, the one where there was a

14  reversal by the Second Circuit, the people -- I keep saying the

15  "people," I'm sorry.

16          THE COURT:  No, I know what you mean.

17          MS. ALDEA:  You know I'm a state prosecutor, I have

18  given myself away.

19          THE COURT:  I totally get it.

20          MS. ALDEA:  So the people, the prosecution in *Coppa*

21  actually turned over the very content, the very witness

22  statements that they're arguing about now in this case.  The

23  same type.  So it wasn't a question of not disclosing those

24  witness statements.  It was a question of not disclosing purely

25  impeaching material that was the fight in *Coppa*.

1          THE COURT:  Right.  Right.  Thank you very much.

2          MS. ALDEA:  Thank you, your Honor.

3          THE COURT:  Ms. Comey.

4          MS. COMEY:  Thank you, your Honor.

5          Starting with the issue of DOJ's internal process.

6          THE COURT:  Yes.

7          MS. COMEY:  I'm pretty sure there's a consensus here,

8    I hope, that the administrative process within the Department

9    of Justice, whereby that department decides how to exercise its

10   prosecutorial discretion, does not give a defendant any rights,

11   any rights to have any commentary on that decision, or make any

12   submissions to the Department of Justice as it makes that

13   decision.

14          What the defense is saying is that your Honor should,

15   in your discretion, order us to turn over what they argue as

16   *Brady* material.  So what this really goes to is -- what they

17   are really asking you to decide is whether or not this

18   information, the details behind the Government's current

19   position that Mr. Tartaglione was not present during the final

20   three murders, constitutes *Brady* material.  And as we've set

21   forth in our papers, it simply is not.

22          The defense now has the government's theory of the

23   case that he was not present during those final three murders,

24   but was nevertheless culpable on aiding and abetting felony

25   murder or Pinkerton theory.

                 Angela O'Donnell, RPR, 914-390-4025

1          And for the record, aiding and abetting language was

2     in the original charging document, and those three theories

3     have mentioned to defense counsel during all of our meetings.

4     So this should not be coming as a surprise that those theories

5     have always been possibilities.

6          What the defense is asking for, essentially, is extra

7     details that support the government's case and that the

8     government is going to be using at trial in its affirmative

9     case in chief to prove the defendant's guilt.

10         THE COURT:  What if the statements that are -- let's

11    say you get some witnesses who give you a series of statements,

12    and one of the statements is that Mr. Tartaglione wasn't there

13    when these three individuals were shot but provides information

14    that to you seems maybe neutral at worst, or inculpatory, but

15    could actually be exculpatory in ways that you can't even

16    imagine.  I mean, I think that's the point, is that all they

17    want is the statements to see whether or not there's something

18    in there that they can mine to not only present mitigating

19    factors to the Justice Department but also prepare the defense.

20         MS. COMEY:  Well, with respect to the mitigating

21    factors, those statements we already have.  We can already look

22    at them and we can already evaluate them ourselves.

23         THE COURT:  Assuming that you can interpret those

24    statements as mitigating factors; right?  Because it may be

25    that, as much as you try to keep an open mind about what could

1   be *Brady* and exculpatory or mitigating, you're not in a

2   position, you don't have the knowledge that counsel for

3   Mr. Tartaglione have where they are doing their own

4   investigation and they can see a statement and see its value in

5   a way that only they can do.

6          So I don't think that's -- that's not a controversial

7   point.  Of course they're in a better position to know what

8   might be helpful to their client.  No disrespect to you and the

9   folks at Justice, but that's their mission in life, is to look

10  for those facts that could be helpful to their client, they are

11  going to be more keen, they're going to be more creative, more

12  imaginative and just more capable of knowing what could be

13  useful to them.

14         MS. COMEY:  So the problem with that, your Honor, is

15  that that leads to the slippery slope that I believe your Honor

16  was talking about while defense counsel was speaking.  That is

17  theoretically possible with respect to virtually any witness

18  statement.  It is theoretically possible with respect to

19  virtually any piece of evidence.  That's why *Brady* has a

20  materiality requirement.  That's why the question is whether

21  those statements are clearly material.  So not only just

22  potentially exculpatory, maybe tend to help the defense in

23  defending the case, but are material, and so here any statement

24  that is not -- that would be required that much interpretation

25  and that would only be potentially helpful to the defense with

1   their particular view is not clearly material.

2            THE COURT:  Right.  So there's the *Brady* right and

3   then there's the *Brady* right applied to a potential capital

4   case.  So it is sort of a *Brady* right on steroids.  I mean,

5   because the death is different case law.  It says what it says.

6   And so what counsel are saying is, look, we don't want to try

7   to make *Brady* so elastic that this is going to be the case in

8   every prosecution, but here we're talking about the potential

9   of the death penalty, and so maybe there should be, in the

10  exercise of a court's discretion, some accounting for that

11  phenomenon, that circumstance here.

12           What's wrong with viewing it through that lens?

13           MS. COMEY:  Well, your Honor, I think that the way to

14  handle that would be what we've already done, which is

15  providing your Honor, in camera, the statements to look and to

16  see whether there is some sort of potential nugget in there

17  that we may have overlooked that an impartial fact-finder might

18  find.

19           THE COURT:  So what I got, though, is a summary.  I

20  didn't get -- if there are any statements, and these are

21  statements that are presumably recorded in reports, different

22  agencies have their different nomenclature for them, whatever,

23  302s or 7s, I forget what they're all called.  That I don't

24  have.  What I have is the government's summary of the basis for

25  the information that you provided to counsel for

                    Angela O'Donnell, RPR, 914-390-4025

1  Mr. Tartaglione.

2       MS. COMEY:  Which include the detailing of any

3  specific witness statements that might also lead to the

4  conclusion, none of which suggest any sort of exculpation of

5  the defendant on the theories of aiding and abetting liability

6  or Pinkerton or felony murder theory.

7       Hypothetically, were the statements themselves to

8  involve something like the defendant left and he had no idea

9  that the other three victims were even in the bar, he never saw

10  them that day, that would be exculpatory, certainly something

11  to that degree.  Something that added more detail or nuance to

12  what he saw, or didn't see, or something like that, that

13  perhaps went to the core of aiding and abetting or felony

14  murder or foreseeability.  But that is not what these

15  statements are.

16       THE COURT:  So to be clear, what you've done in the

17  submission for *in camera* review is provide the information,

18  including statements that related to Mr. Tartaglione's absence

19  when these three individuals were shot.  And you recognize, of

20  course, I don't think there could be any dispute, that if the

21  other information, including statements, was that he had no

22  idea, or he was angry when he heard about how they were shot,

23  or something that's just clearly exculpatory, you would have

24  turned that over.

25       The issue for Mr. Tartaglione is that his lawyers

1   might be able to spot material information in what to you might

2   be ambiguous or neutral information.  So we can agree that

3   where the light shines on the information that's clearly

4   inculpatory or exculpatory, your obligations are going to

5   follow from that.  It's the gray area.  And they're saying, if

6   they don't get the details, they can't mine the gray area.

7           MS. COMEY:  Your Honor, again, that is true in

8   virtually ever case, but that does not entitle the defense to

9   all witness statements regarding potential absence from a

10  scene.  And playing out some scenarios in other kinds of cases

11  where the same request might be made also points to the problem

12  here.

13          I mean, you can imagine a murder-for-hire case, for

14  example, where the defendant hired the murderer and therefore

15  wasn't present.  So any witness to that murder would very

16  clearly say, wasn't present.  He wasn't there.  He wasn't

17  around.  Government agrees and tells the defendant, your guy

18  hired the murderer, wasn't present for it.  That statement

19  alone does not entitle that defendant to every witness

20  statement about what happened at the murder so that they can

21  then go a fishing expedition to figure out whether there would

22  be any sort of nugget that they might want to use.  That is not

23  what *Brady* requires.

24          THE COURT:  So isn't this a just question of timing?

25  I mean, to the extent that the information that you provided to

1   counsel is at least derived from witness statements, and these

2   are individuals who are going to testify at trial, you're going

3   to be turning over the reports of their interviews and their

4   statements anyways, whether it's pursuant to Jencks or because

5   of the court's discretion or due process clause anyway.  So

6   it's just a question of timing.

7           So it's sort of like my grandmother used to say, why

8   put off till tomorrow what you can do today.  If you're going

9   to have to give these things over eventually, what's the

10  downside to giving them over now?

11          MS. COMEY:  So, your Honor, first of all, we're not

12  required to give them over earlier under Jencks, unless they

13  are *Brady*, and in terms of the timing and what the case law

14  says about the timing --

15          THE COURT:  Well, you see the cases that counsel

16  cited, it says immediately; right?  So immediately means now.

17          MS. COMEY:  Yes, your Honor.  But talking about, I

18  believe it's the *Gill* case particular, that talks about the

19  timing in order to have sufficient time opportunity to use the

20  information, the fact that defense counsel has known now months

21  and potentially more than just months in advance of a trial,

22  that the government's theory is that the defendant was not

23  present for these three murders, is more than enough to give

24  them the context they need, as soon as they receive those

25  statements, to then look for the critical pieces and use it.

1          And it's also more than enough for them to use the

2     Rule 16 discovery, which also supports this theory and to

3     target it as well.  They know the specific timeframe when these

4     murders happened.  They have been given specific pieces of Rule

5     16 discovery that support his absence.  We have made ourselves

6     available to talk with defense counsel about those specific

7     pieces of discovery, and so they can already use that to build

8     their leads.  And then, as soon as they get those statements,

9     in accordance with the schedule that your Honor normally sets,

10    they will be in a fine position to use any additional

11    information regarding the defendant's absence from those

12    murders.

13          THE COURT:  But that's the timing point.

14          Let's just say, hypothetically, we set a trial date

15    for -- I don't mean to scare anybody, but let's say we set a

16    trial date for a year from now.  As you know, as your office

17    knows, and I assume counsel know from talking to others, I make

18    the government provide its exhibits they're going to introduce

19    in the case in chief well in advance.  We get *in limine*

20    motions.  The 404(b) has got to be produced way in advance and

21    the 3500 material gets produced way in advance.

22          So let's say that I had a schedule that says if we're

23    going to start the trial on November 21 of 2018, the

24    government's got to turn over its Jencks material by

25    October 1st, 2018.

1          So it's just a question of whether counsel gets it

2     now or they get it October 1st of 2018.  That's really what

3     this comes down to; right?

4          MS. COMEY:  The question, though is, it comes down to

5     whether or not it's *Brady*, then there would be a reason to have

6     it --

7          THE COURT:  Because Jencks would require you to turn

8     over the statements anyways, because certainly anything they

9     would say about Mr. Tartaglione's presence or absence will be

10    material to their testimony; right?

11         MS. COMEY:  Well, your Honor, as your Honor pointed

12    out, Jencks doesn't actually require us to turn over those

13    statements until after a witness has testified on direct.  We

14    do so earlier as a courtesy.

15         THE COURT:  I do it even earlier than your courtesy.

16         MS. COMEY:  Yes, your Honor.  And we comply with

17    that.

18         THE COURT:  Yes.

19         MS. COMEY:  But earlier would -- what our position

20    is, the only justification for turning over witness statements

21    earlier, would be is if they contain *Brady*, and here they do

22    not.  They are consistent with the government's theory.  And,

23    in addition, even if they were somehow exculpatory, these extra

24    statements, to the extent there are any that say

25    Mr. Tartaglione was not present, are cumulative of the Rule 16

Angela O'Donnell, RPR, 914-390-4025

1  evidence that they've already received, as well as our

2  admission, our statement, that our theory of the case is that

3  he was not present.

4            THE COURT:  Right.  But getting back to my point

5  about the timing.  If I did set a trial date for a year from

6  now, I would have, consistent with how I've done other cases in

7  the past, and assuming this was a capital case, I would be more

8  inclined to push the deadlines up.  So you would be talking

9  about either providing the statements in the next week or so,

10 or in the next 11 months; 10 or 11 months.  It's just timing.

11           And so I guess -- what's the downside to having it be

12 done now, as opposed to 10 or 11 months from now?

13           Is it just principle or is there something else that

14 gives you pause to say, no, we really don't want them to have

15 this statement?

16           MS. COMEY:  Your Honor, one is principal, and one is

17 safety of the witness, of any witnesses, and any loved ones or

18 family members of them.  This is a case that involves serious

19 violence.  It includes the murder of three people purely

20 because they witnessed a crime.  We are concerned about the

21 safety of our witnesses.  And the closer to trial that counsel

22 receives this information, the better we are able to ensure

23 safety.

24           THE COURT:  Okay.  Other points you want to address.

25           MS. COMEY:  Not unless your Honor has any further

1    questions.

2              THE COURT:  I don't.

3              MR. BARKET:  If I --

4              THE COURT:  Absolutely.  Take your time.

5              MR. BARKET:  One thing, quickly, your Honor.  The

6    only point the distinction I would draw from the prosecutor is,

7    when they say that every witness statement provides a potential

8    nugget that we could use differently.  Well, that's certainly

9    true.  We're not talking about the entire body of their case.

10   We're, obviously, just talking about the fairly narrow body of

11   evidence that leads to the conclusion or establishes the fact

12   that Nick wasn't present when three individuals were shot.

13   That's the body that we're talking about.  So we're not -- the

14   slippery slope ends there.  There's another cascade, if you

15   will, another cliff, I suppose, you can fall off of, but the

16   information we're seeking in this instance just relates to

17   that, in our view, exculpatory fact.  There's been -- I guess

18   your Honor has said this a few times and the government just

19   said it, that we know when and where these individuals were

20   shot.  That's not something Nick has ever known.

21             THE COURT:  I haven't --

22             MR. BARKET:  So we don't know where he was when they

23   were shot, because we don't know when they were shot.  There's

24   some information that we can glean from the government's

25   submission --

                   Angela O'Donnell, RPR, 914-390-4025

1              THE COURT:  Yeah.

2              MR. BARKET:  -- that they were -- just to be specific

3     about it, am I permitted to read from their submission?

4              THE COURT:  Yeah, yeah, of course.  Yes.  That's not

5     filed under seal or anything; right?

6              MS. COMEY:  That's fine, your Honor.  It's public.

7              MR. BARKET:  So they indicate that after Nick left --

8              THE COURT:  I'm sorry, is this the October 19th

9     letter or is it some other letter that --

10             MR. BARKET:  October 19th letter.

11             THE COURT:  Yes, okay, but what page are you on?

12             MR. BARKET:  Page 2 of 6.

13             THE COURT:  Okay.

14             MR. BARKET:  It says here that, after Nick left that

15    the other three individuals were shot and killed at the bar.

16             Now, that fact or that statement in there is, I

17    think, the first time that I've seen that put definitively.

18    We've had previous conversations with the government about this

19    and it was their belief or understanding or assumption that the

20    individuals were shot at the bar, but the forensics don't bear

21    that out.  The forensics that we've gotten so far only show the

22    DNA of the first individual, Martin, a very small amount of

23    what I believe is -- what they believe is his blood and DNA.

24    There's no blood or DNA of the other three individuals there at

25    all, at least not that I'm aware of.  So assuming that they now

74

 1    say, okay, they were shot there, it doesn't answer the question

 2    when.  This wasn't an open establishment.  This was a bar that

 3    had been closed for some time and it was opened up for specific

 4    reasons.

 5         So we don't know when they were shot.  The idea that

 6    Nick knows where he was when this all took place, presupposes

 7    that he has a specific memory of these events, and I guess,

 8    assuming guilt, he would, because it's not every day that

 9    you're involved in the murder of one or four people.  Assuming

10    innocence, it's another day in his life.  He might remember

11    some specific, you know, I remember being at the bar with, my

12    brother's bar or whatever, but I don't remember everything I

13    did for the next week or so.

14         And the burial, as we understand it, took place

15    someplace between April 12th or 13th.  I forget the date of the

16    disappearance, and when there was a satellite photograph that

17    shows some disturbance in the land about a week or ten days

18    later.  There's a big window of when these individuals could

19    have been shot.  In that one line, I'm assuming they wrote it

20    on purpose, but I don't know, from our conversations with them,

21    that that had moved from we think to we know.

22         THE COURT:  The one line about that after -- the

23    sentence you read, After Tartaglione left with the first body,

24    Urbano Santiago, Miguel Luna and Hector Gutierrez, the others

25    were shot and killed at the bar.

Angela O'Donnell, RPR, 914-390-4025

1           MR. BARKET:  Correct.

2           THE COURT:  Okay.

3           MR. BARKET:  That had always been kind of a working

4    theory, as I understood it from the government.  If it's moved

5    from working theory to now we know, okay.  Well, that's part of

6    the --

7           THE COURT:  From speculation to fact.

8           MR. BARKET:  At least --

9           THE COURT:  Or theory to fact.

10          MR. BARKET:  Their belief.  We're going to present

11   this case to a trier of fact who will get to decide.

12          THE COURT:  Right.  And whether or not somebody was

13   there or not would be maybe a fact that they would have to --

14          MR. BARKET:  Well, there would be evidence that would

15   suggest to them that they can draw that conclusion, or that

16   they can find that fact, however you want to phrase it.

17          But that information -- so, I guess the two points

18   that I wanted to make briefly -- that I failed at least the

19   briefly part was, we're not looking to dive into the entire

20   body of their case, just this information.

21          And, two, I mean, if they know when these individuals

22   were shot, that would certainly help us a little bit --

23          THE COURT:  Okay.

24          MR. BARKET:  -- in narrowing down.

25          MS. COMEY:  Your Honor, it's noted in footnote one of

1    our letter, which says it's in the afternoon and evening of

2    April 11, 2016.  That's always been the key time period.  It's

3    highlighted in our search warrant application.  It's

4    highlighted in the Rule 16 discovery.  And we've made ourselves

5    available to discuss that in more detail.

6              They have certainly been provided with warrant

7    applications that walk through specific pieces of Rule 16

8    discovery and timestamps and times that are particularly

9    relevant.

10             And I'd also note, as I believe we've noted in our

11   submission to your Honor, that all of this is based on the

12   evidence currently available to us.  We are always

13   investigating.  But that is our theory of the case, as I stand

14   here today, given the evidence that we have.

15             MR. BARKET:  Oh, thank you, that's certainly helpful.

16             One other, and we'll take them up on the offer to sit

17   down and chat in more detail about some of this.

18             We are going to ask, however, that your Honor -- we

19   understood that the government was going to provide to your

20   Honor the underlying statements and/or evidence or whatever it

21   is that's at issue here.

22             THE COURT:  Yes.  Right whatever it is.

23             MR. BARKET:  Right.  Not a summary of it.  A summary

24   of it we kind of already sort of have.

25             THE COURT:  Yes.

                 Angela O'Donnell, RPR, 914-390-4025

1          MR. BARKET:  I thought that your Honor then would

2     have the opportunity to look at the specific statements, 302

3     reports, evidence, whatever it is, and then make a decision

4     following that *in camera* review.

5          It wasn't my understanding the government was simply

6     going to provide a summary of that, because that doesn't even

7     give your Honor the opportunity to look to see maybe there's

8     something there that really is exculpatory, and really should

9     be disclosed earlier.  And your Honor is in, I think, a

10    slightly better position than the government is to view it from

11    the defense's eyes and no disrespect, but -- not as good as

12    position as us.

13         THE COURT:  There's no question.

14         MR. BARKET:  So I would like to it to move from

15    exclusively to them to at least you.

16         MS. COMEY:  Your Honor, we provided the summary

17    because we believed it was much more efficient, but I'm happy

18    to provide your Honor with whatever notes or reports there are

19    to the extent you believe it would be helpful in reaching your

20    decision.

21         THE COURT:  You know, I don't see the downside to

22    that.  Efficiency is not a priority in the criminal justice

23    system.  So let's be thorough.

24         I think that's a very good suggestion, Mr. Barket.

25         I thank you in advance for providing that, Ms. Comey.

1              MS. COMEY:  And is this with respect to any witness

2    statements or also any Rule 16 discovery?

3              THE COURT:  Why don't we do this.  I think any

4    witness statements, we'll start with, and maybe the Rule 16

5    discovery after I read the witness statements, I may come back

6    and ask for some followup on any Rule 16 discovery, sort of

7    consistent with Mr. Barket's point about I can't wear your hat,

8    Mr. Barket, but at least I'm not wearing the prosecution hat.

9              At least I can see, after reading the full

10   statements, if there is Rule 16 material that I might want to

11   take a look at.  Okay?

12             MR. BARKET:  Just one other small point.

13             THE COURT:  Yes.

14             MR. BARKET:  If some of this information is actually

15   in the discovery already and already been provided to us, so

16   it's kind of in this -- it's not really a mountain yet, to be

17   honest, I mean, it will grow that big, I'm sure, but it's

18   substantial.  What's the problem with saying --

19             THE COURT:  You know, I meant to ask Ms. Comey that

20   question.

21             So, yes.  What about that?

22             MS. COMEY:  We're happy to, your Honor.  We've met

23   with them multiple times, and our understanding was that they

24   already had seen that particular Rule 16 discovery.  But I have

25   no problem doing that, your Honor.

1            THE COURT:  Okay.  I'm happy to schedule a criminal

2    equivalent of a mediation, if you want.

3            MR. BARKET:  No, we have actually -- I think, at

4    least from my perspective, we've gotten along fine.

5            THE COURT:  I'm not worried about that.  I'm just

6    saying maybe to facilitate the provision of direction.

7            MR. BARKET:  The what?

8            THE COURT:  Providing direction.

9            MR. BARKET:  Oh.

10            THE COURT:  Where within the growing mountain one

11    might find the evidence that supports the disclosure that was

12    made.

13            MR. BARKET:  I'd be happy to take the Court up on

14    that, but maybe to save the Court some time, we could get

15    together --

16            THE COURT:  The reason I always offer that is because

17    the last thing people want to do is spend an afternoon with me.

18    It forces them to get together.  So it looks like mission

19    accomplished.

20            MR. BARKET:  Very well.  Happy to spend an afternoon

21    with you.

22            THE COURT:  Really don't want.  There's ERISA cases

23    back there.  There's patent cases back there.  You don't want

24    to.

25            MR. BARKET:  Those I don't want to spend time with.

                  Angela O'Donnell, RPR, 914-390-4025

```
 1                    THE COURT:  Yes, you don't want to be around that.
 2                    All right.  So Ms. Comey, I'm conscious of the fact
 3        that we're upon the Thanksgiving holiday.  When realistically
 4        can you get me the sort of follow-up in camera review
 5        materials?
 6                    MS. COMEY:  May have I have a week, your Honor?
 7                    THE COURT:  Yeah, that's fine.  That okay with
 8        counsel?
 9                    MR. BARKET:  Of course, your Honor.
10                    THE COURT:  Ms. Comey, if you need more time, just
11        let me know.
12                    Anything from either side?
13                    Let me just say as a consumer of advocacy this was
14        advocacy at its finest.  My questions are sharp, not because of
15        any other reason than I'm trying to fine tune the advocacy and
16        I thought the answers by all were well thought out and well
17        reasoned.  So if this is a precursor of what's to come, then
18        this is going to be a good case from a lawyer's junky's
19        standpoint.  So thank you counsel, to all of you.
20                    MR. BARKET:  Thank you.
21                    MS. ALDEA:  Thank you.
22                    THE COURT:  With that, I'll bid you a Happy
23        Thanksgiving.
24                    MS. COMEY:  Your Honor, should we schedule another
25        date?
```

1          THE COURT:  Let me look at the materials first and

2    then try to schedule a date.  Is that okay?  Because also if

3    there's going to be a conversation between you all --

4          MR. BARKET:  It would --

5          THE COURT:  Well, let's give you a date.  Let's just

6    give you a date to have on the calendar.

7          MR. BARKET:  We've been conscious of not letting the

8    time become a relevant factor.

9          THE COURT:  Yeah, yeah.  That's fine.  So let's give

10   you -- how much time do you think you all need to have a chat?

11         MR. BARKET:  I'm assuming we can do it sometime

12   before Christmas, or the end of the year.  So sometime in

13   December.

14         MS. COMEY:  Yes, your Honor.

15         THE COURT:  Okay.  Towards the end, I take it.

16         MR. GOLTZER:  Excuse me, Judge.

17         THE COURT:  Yes.

18         MR. GOLTZER:  I'm out of the country December 21 to

19   January 2.  I don't know if Mr. Stern's available.  We would

20   like to be here.

21         THE COURT:  Of course, of course.

22         I can tell you we just had a civil trial go away that

23   was supposed to start January 3rd, so we can do January 3rd; is

24   that okay with you all?

25         MS. COMEY:  I'll be out of the country that week,

 1   your Honor, but Mr. Gerber might be --

 2              MR. GOLTZER:  We don't need --

 3              THE COURT:  Yes, nobody wants Gerber.  I'm sorry,

 4   when were you out of the country, 20th to 21st?

 5              EURBGS:  I'm coming back the 1st of January.

 6              THE COURT:  So what if we did December 19, does that

 7   work?

 8              MR. BARKET:  Yes.

 9              THE COURT:  Everybody's in the country?

10              MS. COMEY:  Yes, your Honor.

11              MR. GOLTZER:  Thank you, Judge.

12              THE COURT:  Okay.  All right.  So let's say

13   December 19, 3:00.

14              MR. BARKET:  That's fine, Judge.

15              THE COURT:  Is that okay?

16              MR. BARKET:  Yes.

17              THE COURT:  All right.  And I think time is

18   technically excluded anyway, but I'm going to prospectively

19   exclude time from now until December 19th, finding it's in the

20   interest of justice to do so.

21              There are a number of reasons for that:  One is

22   there's a motion pending; two is that the capital review

23   process is ongoing, both in Washington and still here in

24   New York.

25              Right, Mr. Goltzer?

                    Angela O'Donnell, RPR, 914-390-4025

1           MR. GOLTZER:  Yes.

2           THE COURT:  Got it.  And then third, of course, is

3      there needs to be time for counsel to review the discovery and

4      continue to prepare the defense of their clients.

5           So for all these reasons:  The interest of justice

6      from this exclusion outweigh each defendant's and the public's

7      interest in a speedy trial, and the findings made pursuant to

8      18 USC Section 3161(h)(7)(a).

9           With that, we're adjourned.

10          MR. BARKET:  Thank you, Judge.

11          MS. COMEY:  Thank you, your Honor.

12          (Proceeding concluded)

13     CERTIFICATE:  I hereby certify that the foregoing is a true and
       accurate transcript, to the best of my skill and ability, from
14     my stenographic notes of this proceeding.
                   ------------------------------------
15     Angela A. O'Donnell, RPR, Official Court Reporter, USDC, SDNY

16

17

18

19

20

21

22

23

24

25

                   Angela O'Donnell, RPR, 914-390-4025